## STATE

### v.

### José GONZALEZ.

### No. 2011–194–C.A.

Supreme Court of Rhode Island.

Dec. 10, 2012.

---

Jane M. McSoley, Department of Attorney General, Providence, for State.

Catherine Gibran, Office of the Public Defender, Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

The defendant, José Gonzalez, appeals from a judgment of conviction on one

count of first degree child molestation and two counts of second degree child molestation stemming from events that allegedly occurred at 131 Lincoln Avenue in Central Falls on June 30, 2007. The defendant is the great-uncle of the complaining witness. On appeal, the defendant contends that the trial justice erred in failing to grant his motion for a new trial due to what he characterizes as the lack of credibility of the witnesses and as the inconsistent evidence concerning the alleged molestations.

This case came before this Court for oral argument on September 25, 2012. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

On September 28, 2007, a grand jury indicted defendant on one count of first degree child molestation (count 1), in violation of G.L.1956 § 11–37–8.1,[1] and three counts of second degree child molestation (counts 2 through 4), in violation of § 11–37–8.3.[2] Upon defendant's motion pursuant to Rule 29 of the Superior Court Rules of

1. General Laws 1956 § 11–37–8.1 provides, in pertinent part, that "[a] person is guilty of [a violation of § 11–37–8.1] if he or she engages in sexual penetration with a person fourteen (14) years of age or under."

2. Section 11–37–8.3 provides, in pertinent part, that "[a] person is guilty of [a violation of § 11–37–8.3] if he or she engages in sexual contact with another person fourteen (14) years of age or under."

3. Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure requires the Superior Court "on motion of a defendant or on its own motion [to] order the entry of judgment of acquittal of one or more offenses charged in the * * * information * * * after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

Criminal Procedure,[3] the trial justice dismissed count 3.[4] The defendant's trial commenced on June 29, 2010. The state presented the testimony of four witnesses— viz., the complaining witness (whom we shall refer to as Stephanie [5]), her father, a responding police officer, and a pediatrician who examined Stephanie; defendant opted not to present any testimony.

## A

## The Testimony of Stephanie

Stephanie testified that, at the time of the incidents at issue (viz., the Summer of 2007), she was living with her mother, her father, her sisters (the elder of whom we shall call Natalie and the younger of whom we shall call Alice), and her infant nephew (whom we shall call Adam). She further testified that defendant, who is her father's uncle (and therefore her great-uncle), also resided with her family.

Stephanie testified that, on June 30, 2007, her father and defendant spent "the whole day" drinking on the porch of the family's dwelling in the company of two of their friends. Stephanie testified that the porch door opened into the kitchen. We

4. The three counts submitted to the jury were as follows: (1) that on June 30, 2007, defendant "engage[d] in sexual penetration, to wit, digital/vaginal penetration, with [the complaining witness], a person 14 years of age or under;" (2) that on June 30, 2007, defendant "engage[d] in sexual contact, to wit, mouth/breast contact with [the complaining witness], a person 14 years of age or under;" and (3) that on June 30, 2007, defendant "engage[d] in sexual contact, to wit, hand/vaginal contact with [the complaining witness], a person 14 years of age or under."

5. We have employed pseudonyms to refer to both the complaining witness and the members of her family in order to protect their privacy.

infer from Stephanie's testimony that the first floor of the house contained the kitchen, the living room, her parents' bedroom, and defendant's bedroom. We further infer from Stephanie's testimony that the second floor of the house contained the bedrooms of Natalie and Alice as well as her own. Stephanie testified that her bedroom did not have a door because it was broken and her father had removed it.

Stephanie testified that, on June 30, 2007, she was in the kitchen playing with a puppy; she added that Natalie was in her own bedroom upstairs while Adam (Natalie's baby) and Alice were in the living room. Stephanie stated that defendant entered the kitchen from the porch in order to "[get] something out of the [refrigerator]" and asked her to "[c]ome here." Stephanie further testified that she "[d]id what he told [her] to;" she stated that she walked over to him and that he "started touching" her. When asked to clarify the "touching," Stephanie responded that he touched her "private" and that he did so over her clothes. The prosecutor then asked whether defendant touched "any other part of [her] body;" Stephanie stated that defendant "lifted [her] shirt and * * * kissed [her] breasts." It was Stephanie's testimony that she was in the kitchen for ten minutes before she ran upstairs to her bedroom.

Stephanie testified that, when she arrived in her bedroom, she "laid down with [her] care bear." When defense counsel then asked her whether she was "actually laying on [her] stomach," Stephanie responded: "Yes." Stephanie testified that she saw defendant come into her room while she was lying on her bed. She further testified that defendant then kissed her on the lips and touched her "[w]ith his fingers" as he was kissing her. When asked by the prosecutor whether defendant touched her over or under her

clothes, Stephanie responded that he had touched her under her clothes. The prosecutor then asked her: "[W]hen he touched you under your clothes, what did he do?" Stephanie's response to that question was that he "touched [her] private." She testified that defendant told her: "You're beautiful" and that he also said: "Don't tell anyone." Stephanie also testified that defendant was in her bedroom for about fifteen minutes; but, upon further inquiry by the prosecutor, she acknowledged that she was trying to estimate the time and that "maybe" defendant had been there for less than fifteen minutes.

Stephanie testified that she then heard someone walking up the stairs and that defendant ran out of her bedroom. She stated that her father subsequently entered her bedroom, where she was crying. According to Stephanie's testimony, her father asked her: "What happened?" Stephanie testified that she told him what had happened and that he then "freaked out" and "started crying." She further stated that, in accordance with her father's suggestion, she then went to her parents' room; she added that she then told her mother "what happened."

Stephanie testified that other family members arrived at the house; she added that defendant was in his bedroom while she remained "upstairs in the room." When asked by the prosecutor if she remembered "going to the Police Department" and "talking to the police officer," Stephanie replied in the affirmative as to both questions; she further testified that her mother "brought [her] to the hospital," where "[t]hey examined [her]."

## B

### The Testimony of Stephanie's Father

Stephanie's father testified that defendant, who is his uncle, had been living with the family since May of 2006 and was still

living with them in June of 2007. Stephanie's father testified that, on June 30, 2007, he, defendant, defendant's girlfriend, and another friend were sitting and "drinking a couple of [beers]" on the porch because it was a "beautiful day." He testified that one could see into the kitchen from the porch and that one could see onto the porch from the kitchen. He further testified that the door leading from the porch into the house was wide open. He also testified that they were outside for "about [an] hour, maybe less, two hours."

Stephanie's father testified that at "something close to 8:00 o'clock or 8:30," when "it wasn't daylight, but * * * was in between," defendant walked from the porch into the house in order to obtain another beer; he stated that he saw defendant going right into the kitchen. Stephanie's father testified that he "got distracted" talking to his friends and that between five and ten minutes went by without his seeing defendant. He further testified that he then went inside in order to "see what happened." Stephanie's father stated that he did not see anyone in the kitchen; he added that his younger daughter and his grandson were in the living room at the time. The father testified that he next walked into defendant's bedroom, then into the bathroom, and then down the stairs into the basement—all presumably while searching for defendant.

Stephanie's father testified that he next looked again into the living room and "screamed" for his daughters Natalie and Stephanie, neither of whom responded. The father testified that one small bedroom and two larger bedrooms were located upstairs. He further testified that Stephanie slept in the first bedroom to the left and that Alice slept in the middle bedroom, through which one walked so as to access Natalie's room.

He testified that he subsequently walked up the stairs and saw defendant coming out of Alice's room. He stated that he then asked defendant: "What happened? What are you doing up here?" He testified that defendant answered that he had come upstairs "to check the baby because [he had] heard him cry." The father testified that he told defendant that the baby was downstairs and that defendant mumbled and proceeded to go downstairs.

Stephanie's father testified that, after defendant walked downstairs, he ran to Natalie's room to ask her whether defendant had been in her room and that he then ran to Stephanie's room. He further testified that, when he entered Stephanie's room, he turned the light on and saw Stephanie crying and sitting on one corner of her bed. According to his testimony, the father then asked her: "Did he touch you?" He testified that his daughter "shook her head" and said: "Yeah." He explained that the question that he addressed to Stephanie was "the first thing that came out of [his] mouth" and was prompted by the fact that he had seen defendant "up there." The father added: "Why would a kid be in the corner of [her] bed crying?"

It was the further testimony of Stephanie's father that he then "blacked out" and that certain members of his family came to the house "in minutes" and called the police, who arrived "immediately." He testified that he stayed outside, surrounded by family, until the police arrived; he added that at some point thereafter he saw defendant being led out of the house. He also testified that his wife took Stephanie to the hospital immediately.

Stephanie's father testified that, on the day following the alleged molestations, he received a phone call from defendant about his bail. He also stated that during that call defendant said: "If you want, I got

some money in my dresser, bail me out and take me for a ride and shoot me twice." Stephanie's father added that defendant called him again two days later and told him that "he didn't do nothing wrong." According to his testimony, the father had not had prior suspicions about his uncle.

## C

### The Testimony of Lieutenant Joseph Gonsalves

Joseph Gonsalves, a retired lieutenant in the Central Falls Police Department, also testified regarding the evening of June 30, 2007. He was then in charge of the 4 p.m. to midnight shift. Lieutenant Gonsalves testified that, at approximately 10 p.m. on June 30, 2007, he received a call from dispatch reporting a sexual assault that had allegedly occurred at 131 Lincoln Avenue. He stated that, because he was on patrol, it "took him a minute or two to get [to that address]."

According to Lt. Gonsalves's testimony, he knew Stephanie's father as a resident of the area; when defense counsel asked him if he had had "prior interaction" with Stephanie's father, he responded that he had. Lieutenant Gonsalves testified that, when he arrived at 131 Lincoln Avenue, at approximately 10:15 p.m., he found the complaining witness's father sitting on the ground in the driveway; he described him as distraught, very upset, and in the process of being consoled by his family. He described the scene outside the house as "chaotic." Lieutenant Gonsalves spoke with Stephanie's father, met with Stephanie's mother inside the house, and proceeded to speak with Stephanie. Lieutenant Gonsalves testified that Stephanie was in one bedroom and that he observed defendant in another bedroom. He stated that, as he prepared to speak with Stephanie, she appeared to him to be "scared,

afraid, [and] nervous." He added that, based upon the information he received, he directed one of the other officers on the scene to take defendant into custody. Lieutenant Gonsalves further testified that Stephanie and her mother thereafter came to the police station, where he took a witness statement from the mother only. He next advised the mother and daughter to seek treatment at a hospital.

## D

### The Testimony of Dr. Christine Fortin

Christine Fortin, a board-certified pediatrician, testified that Stephanie came to the Hasbro Children's Center outpatient clinic on August 22, 2007 for an evaluation at the Sexual Abuse Clinic. Doctor Fortin testified that, although Stephanie's mother reported that Stephanie had been examined in an emergency room on June 30, 2007, Dr. Fortin herself did not examine Stephanie until August 22 of that year.

Doctor Fortin testified that she "took a history" from both Stephanie and her mother in order to make medical decisions, such as those about which laboratory tests to perform. She also testified that it is her practice to ask specific questions of alleged sexual assault victims for the purposes of deciding which treatments and tests are necessary. Doctor Fortin testified that the tests performed would be different for alleged digital penetration as contrasted with alleged penile penetration. According to Dr. Fortin's testimony, the most common finding in alleged digital penetration cases would be a "normal" physical exam, which means that there would not be "any injuries or other physical evidence." Doctor Fortin explained that a "normal" physical exam neither rules out nor confirms that sexual abuse has occurred. She testified that, in her experience treating alleged victims who report digital penetration, approximately 90–

95 percent of alleged victims have a "normal" physical examination. Doctor Fortin testified that Stephanie told her that she had been digitally penetrated. Then, Dr. Fortin testified as to the examinations performed on Stephanie and what those examinations entailed. Specifically, Dr. Fortin testified that she found a "normal" examination for Stephanie and that she recommended that Stephanie seek a follow-up with her physician and mental health counseling.

## E

### The Verdict and Subsequent Motion for New Trial

On Thursday, July 1, 2010, the jury returned with a verdict finding defendant guilty of all three counts that had been submitted to the jury. Subsequently, on October 18, 2010, the parties appeared before the trial justice for a hearing on defendant's motion for a new trial. The trial justice ultimately denied defendant's motion.

The trial justice sentenced defendant on March 4, 2011 to the following terms: (1) on count 1, defendant was sentenced to forty years, with twenty-two years to serve; (2) on count 2, defendant was sentenced to ten years, with five years to serve; and (3) on count 4, defendant was sentenced to ten years, with five years to serve. The sentences were to run concurrently, with credit for time served. The defendant filed a timely notice of appeal.

## II

### Standard of Review

When a trial justice rules on a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, he or she "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State*

*v. Robat*, 49 A.3d 58, 70 (R.I.2012) (internal quotation marks omitted). Acting as the thirteenth juror, the trial justice has the "responsibility to conduct an analytical process consisting of at least three steps." *State v. Guerra*, 12 A.3d 759, 765 (R.I.2011). This three step process requires the trial justice to "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Viveiros*, 45 A.3d 1232, 1244–45 (R.I.2012) (internal quotation marks omitted). Upon the conclusion of the three-step analytical process, if the trial justice "agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *State v. Bunnell* 47 A.3d 220, 232 (R.I.2012) (internal quotation marks omitted). If, however, the trial justice disagrees with the verdict or "does not agree that reasonable minds could differ as to the proper disposition of the case," *Robat*, 49 A.3d at 71 (internal quotation marks omitted), then the trial justice "is required to determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* (internal quotation marks omitted). A trial justice should also include "a few sentences of [his or her] reasoning on each point." *State v. DiCarlo*, 987 A.2d 867, 870 (R.I.2010) (internal quotation marks omitted). The trial justice, in explaining his or her decision, "need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Id.* (alteration in original) (internal quotation marks omitted).

In reviewing a trial justice's decision on a motion for a new trial, "we accord [it] great weight * * * if he or she has articulated sufficient reasoning in support of the ruling." *State v. Texieira*, 944 A.2d 132, 140–41 (R.I.2008); *see also State v. Payette*, 38 A.3d 1120, 1127 (R.I.2012). This Court "employ[s] this deferential standard of review due to the fact that a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *State v. Adefusika*, 989 A.2d 467, 476 (R.I.2010) (internal quotation marks omitted). Accordingly, "this Court will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *Id.* (alteration in original) (internal quotation marks omitted).

## III

### Analysis

On appeal, defendant contends that the trial justice erred in denying his motion for a new trial due to what he characterizes as a lack of credibility on the part of the complaining witness and her father and as inconsistencies in the evidence regarding the alleged molestations.

The trial justice summarized the evidence presented by the four witnesses who testified at trial; she made particular reference to the testimony as to the timing of the alleged sexual molestations. She also noted how the testimony of Lt. Gonsalves tended to corroborate Stephanie's testimony and the testimony about the "condition" of the father.

The trial justice expressly noted that the crucial question for the jury was one of credibility—and most especially the believability (*vel non*) of the complaining witness. The trial justice stated that there was "no question" that "the facts, if believed, by the jury as to what [Stephanie] said would satisfy the three elements of the counts before the Court." The trial justice found that Stephanie was credible and honest in her testimony and "in her appearance," that the jury believed Stephanie, and, moreover, that her father's testimony corroborated Stephanie's testimony "in some fashion." With respect to the father's testimony, the trial justice found that he was credible and that she did "not necessarily disbelieve" his testimony, although she did comment that she had the sense that something was "being left out of the story." Even taking into account her own observation that something was "being left out," the trial justice found that the witnesses were credible, that the jury made a decision in conformity with the charge, and that she herself would not have reached a different conclusion. *See Texieira*, 944 A.2d at 140–42 (discussing the weight afforded a trial justice's decision on a motion for a new trial, particularly when the trial justice has articulated his or her reasoning in making that decision); *see also State v. Jensen*, 40 A.3d 771, 781 (R.I.2012) ("We have also * * * acknowledged that the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not *ipso facto* render the testimony unworthy of belief").

Although defendant challenges the credibility findings of the trial justice, "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." *State v. Ferreira*, 21 A.3d 355, 367 (R.I.2011) (alterations in original) (internal quotation marks omitted). We would fur-

ther note that the trial justice, because she was "present during all phases of the trial, [was] in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Adefusika,* 989 A.2d at 476 (internal quotation marks omitted). This Court has repeatedly stated that the trial justice has the benefit of first-hand observation of the witnesses, and we accordingly "give considerable deference to the reliability and credibility determinations" made by the trial justice. *See Jensen,* 40 A.3d at 780–81 (discussing the weight accorded by this Court to a trial justice's credibility determinations). In our view, the trial justice correctly determined that the main issue in the motion for a new trial was one of credibility, and she explicitly found that the complaining witness was credible and honest.

In passing upon defendant's motion for a new trial, it is clear that the trial justice completed each of the analytical steps that are called for when a trial justice is presented with a motion for a new trial. *See Viveiros,* 45 A.3d at 1244–45 (delineating the three required steps). The trial justice summarized the evidence presented at trial in light of the jury charge. In addition, the trial justice noted that the jury "obviously considered" the arguments made by defense counsel about the location of the alleged molestation and "how that physically happened." The trial justice added that the facts and evidence presented by Stephanie to the jury during the trial would support the verdict against defendant, "if believed" by the jury. Additionally, the trial justice independently assessed the credibility of the witnesses and the weight of the evidence and then determined that she would have reached the same result. Accordingly, the trial justice quite properly denied defendant's motion for a new trial. *See State v. Imbruglia,* 913 A.2d 1022, 1028 (R.I.2007) ("If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied."); *see also State v. Rosario,* 35 A.3d 938, 949 (R.I.2012).

After a review of the entire record, we perceive no clear legal error on the part of the trial justice nor misconception of the evidence in her credibility determinations. *See Ferreira,* 21 A.3d at 367. Accordingly, we hold that the trial justice did not clearly err or misconceive evidence in denying the defendant's motion for a new trial.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to the Superior Court.