**Supreme Court**

No. 2015-129-C.A.
(P1/10-998A)

State                          :

   v.                          :

Oscar Muralles.                :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                                 :

Oscar Muralles.                    :


Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Oscar Muralles, appeals from a judgment of conviction after a jury found him guilty of two counts of first-degree child molestation and two counts of second-degree child molestation—all involving the complaining witness, Rick,[1] the defendant's former stepson, who was born on October 13, 1998 and was fifteen years old at the time of trial in February of 2014.  On appeal, the defendant contends that the trial justice erred in denying his motion for a new trial because, in the defendant's view: (1) the trial justice overlooked and misconceived the evidence; and (2) the verdict failed to truly respond to the evidence and failed to do substantial justice between the parties.

This case came before the Supreme Court for oral argument on October 5, 2016.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1]     We have employed pseudonyms in referring to the complaining witness (Rick), his half-brother (Oliver), his younger half-brother (Wallace), his half-sister (Donna), and their mother (Danielle).

- 1 -

# I

## Facts and Travel[2]

On October 24, 2008, Oliver, the eight-year-old half-brother of Rick, disclosed to their mother, Danielle, that he had witnessed Rick perform oral sex on defendant (who is Rick's former stepfather and Oliver's biological father).[3] Upon being questioned about that allegation by Danielle, Rick testified that he initially denied the incident out of fear and embarrassment, but that he later confirmed its veracity to her.

On March 23, 2010, a Providence County grand jury indicted defendant on two counts of first-degree child molestation, in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.2 (Counts Two and Five), and five counts of second-degree child molestation, in violation of §§ 11-37-8.3 and 11-37-8.4 (Counts One, Three, Four, Six and Seven). A jury trial commenced on February 24, 2014. On February 26, upon defendant's motion pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, the trial justice granted judgment of acquittal on Counts Three, Four, and Six. The remaining counts (Counts One, Two, Five, and Seven) were submitted to the jury, which found him guilty of each of those counts. The trial justice proceeded to sentence defendant to concurrent sentences of: (1) fifty years, thirty-five years to serve, the balance suspended with probation, for the first-degree child molestation convictions; and (2) twenty-five years, ten years to serve, the balance suspended with probation, for the second-degree child molestation convictions.

---

[2] The defendant testified that his birth name is Walter Orlando Muralles; however, he added that he had used the name Oscar Muralles for some time. Subsequently, after becoming a permanent resident of the United States in 2004, he resumed using his birth name. Nevertheless, since the caption of this case bears the name Oscar Muralles, he will be referred to as such herein.

[3] See Parts I.A.1 and I.A.3, infra.

We summarize below the trial testimony that is relevant to the sole issue raised on appeal—viz., whether the trial justice erred in denying defendant's motion for a new trial. We note at the outset that Rick testified in highly specific detail about the multiple incidents of molestation that he accused defendant of having perpetrated between January of 2002 and October of 2008. No beneficial purpose would be served by reproducing here his very graphic testimony (other than that which is essential)—especially since defendant has opted not to challenge the sufficiency of the evidence in support of the counts of which he stands convicted, limiting himself instead to questioning the weight of the evidence and challenging the credibility of various witnesses. See State v. Cook, 45 A.3d 1272, 1273 (R.I. 2012).

**A**

**The Testimony at Trial**

**1. The Testimony of Oliver**

Oliver (Rick's younger half-brother) testified that, in October of 2008, when he was eight, he saw Rick engaged in "sucking" defendant's penis in the basement. When asked by the prosecutor to clarify about the "sucking," Oliver stated that Rick had brought "his mouth and hands" into contact with defendant's penis. It was Oliver's testimony that, on October 24, 2008, he told his mother that he had seen "[his] dad do[] * * * bad stuff." On direct examination, the prosecutor engaged in the following exchange with Oliver:

> "[PROSECUTOR]: And when you told your mom, did you say those words or did you demonstrate it somehow?
> "* * *
> "[WITNESS]: I demonstrated.
> "[PROSECUTOR]: Can you just show the jury what demonstration you were doing[?]
> "[WITNESS]: I got my hand and went like that (demonstrating). I showed it to my mom like that.

"[PROSECUTOR]: So you showed your mom that demonstration. Okay. For the record, that's you with a fist in your hand, going up and down towards your mouth?
"* * *
"[WITNESS]: Yes."

When Oliver was asked by defense counsel why he decided to tell his mother about the just-referenced sexual incident, he replied: "Because * * * I know that it was wrong, but [defendant] was still doing it." He stated that his mother "told [him] to tell the truth." In addition, defense counsel posed questions to a seemingly confused Oliver about whether or not he and Rick discussed the incident.[4]

### 2. The Testimony of the Complaining Witness

It is clear from the testimony of Rick, the complaining witness, that, at the time of the incidents at issue, he was living with his mother, Danielle, and his siblings, Oliver, Wallace, and Donna. He testified that he and Oliver and Wallace used to go to visit defendant almost every weekend at his residence on Penn Street in Providence. Although defendant lived in the basement of his brother's house, Rick testified that, when visiting defendant, he mostly played upstairs with his half-brothers. However, it was also Rick's testimony that there were times when he and defendant were alone in the latter's bedroom in the basement. At trial, Rick described six separate sexual incidents that he testified took place on defendant's bed, during which defendant required Rick to perform sexual acts. While Rick testified that he did not

---

[4] The following exchange ensued during Oliver's cross-examination:

"[DEFENSE COUNSEL]: After you saw [the incident] * * * between [Rick] and your dad, did you talk to [Rick] and say, '[Rick], I saw this?'
"[WITNESS]: No.
"[DEFENSE COUNSEL]: So you never told your brother what you saw.
"[WITNESS]: I told him, but my friend's mom told him is it true that he was doing that."

remember the exact dates when the various sexual incidents took place, he stated that he was "around eight" when they occurred.

It was Rick's testimony that he did not tell anyone about the sexual incidents when they occurred because he was "scared" of defendant. When asked by defense counsel if anyone had witnessed any of the incidents, Rick responded in the affirmative; and the following exchange ensued:

> "[DEFENSE COUNSEL]: Who was peeking through the door?
> "[WITNESS]: My brother [Oliver].
> "[DEFENSE COUNSEL]: And how do you know they were peeking through the door?
> "[WITNESS]: A light turned on.
> "[DEFENSE COUNSEL]: Sorry?
> "[WITNESS]: The [bedroom] door was opening.
> "* * *
> "[DEFENSE COUNSEL]: And you could see somebody peeking through there?
> "[WITNESS]: Yeah.
> "* * *
> "[DEFENSE COUNSEL]: What were you doing th[e] day that [Oliver] was peeking through the door?
> "[WITNESS]: Jerking off – jerking [defendant] off."

Rick further testified that, on October 24, 2008, his mother asked him whether the alleged sexual incident was "true." He stated that he was "embarrassed," and so he "said no [to her] at first [but then] said yeah." When asked on cross-examination if he recalled the words his mother had used to question him, Rick replied in the negative. It was his testimony that he and his mother went "straight to the police station" and talked to a police officer. When asked whether he "remember[s] going to the doctors and getting examined," he replied: "A little."

### 3. The Testimony of Danielle

Rick's mother, Danielle, testified that Rick was around nine months old when defendant came into her life. She testified that, in Rick's eyes, "[defendant] was his father;" she recalled

that "[h]e used to call him * * * Papi." Danielle further testified that she and defendant separated in 2002 because "[h]e didn't want [any]thing to do with the kids." On cross-examination, Danielle denied that the reason that she and defendant separated was because of infidelity on her part; however, she did concede that she entered into another relationship "a couple of months" after she and defendant separated. She further testified that, after the separation, Rick, Oliver, and Wallace would visit defendant on Saturdays—although she clarified that "it was not every Saturday." She stated that, at some point, Rick "started crying * * * on Saturday[s]," saying that "he just d[id]n't want to go [to see defendant]." Since Rick did not explain why he no longer wanted to visit defendant, she continued allowing him to go to the house on Penn Street.

Danielle further testified that, in October of 2008, defendant drove her to visit her then-boyfriend, who was in jail. It was her testimony that "[defendant] asked [her] to get back [together with him]," but she refused. Danielle testified that, after their separation, she never wanted to rekindle their relationship; she added that she was not jealous that defendant had a new girlfriend and a newborn baby. Danielle noted that, until the trial, she did not know that defendant and his girlfriend had given their child the same name as one of her children (viz., Wallace).

According to Danielle, on October 24, 2008, Oliver, who was eight years old at the time, "started telling [her] things" about something that he had seen between Rick and defendant. She then "talked to * * * [Rick]" and asked him "some questions;" she added that, shortly thereafter, she accompanied Rick to the police station. After Danielle found out about what had purportedly taken place between Rick and defendant, she no longer allowed her sons to visit him.

#### 4.  The Expert Medical Testimony

Doctor Christine Barron, one of the two physicians who examined Rick at Hasbro Children's Hospital, was also a witness for the prosecution; she testified as an expert witness, qualified in child abuse pediatrics.  Doctor Barron testified that, on October 28, 2008, she observed her colleague, Dr. Kenneth McCann, "t[ake] a history from the DCYF child protective investigator and [Rick's] mother" in order to obtain the boy's medical history as well as information regarding the sexual allegations.  She explained that the purpose of taking such a history from alleged sexual abuse victims is for medical diagnosis and treatment.  Doctor Barron further testified that, after obtaining Rick's medical history, she and Dr. McCann conducted a complete "head-[to]-toe" physical examination of Rick, including a genital exam and a rectal exam (by means of a colposcope).  It was her testimony that the result of Rick's physical examination was "normal."  According to Dr. Barron, in her experience treating over five thousand children in a fifteen-year time span, the physical examination results of 95 percent of children who have alleged sexual abuse were "normal;" she explained that that means that there would not be "any trauma or injuries."  She testified that the reason for this is that "penetration with some micro trauma * * * heal[s] in one to two days."  She stated that a "normal" physical examination does not preclude a determination that sexual abuse has occurred.

#### 5.  The Testimony of Detective Rotella

Detective Christopher Rotella of the Providence Police Department was called by the defense and testified that, on October 24, 2008, he interviewed Rick, who was then age ten, in order to elicit preliminary facts about the sexual assault allegations.  He stated that he referred Rick to the Central Assault and Trauma Center for an interview, which took place on November

19, 2008. It was Det. Rotella's testimony that he subsequently arrested defendant and proceeded to interview him; Det. Rotella said that defendant "refused to audio record a statement, but * * * denied" that he had sexually molested Rick.

### 6. The Testimony of Victor Muralles

Victor Muralles, defendant's brother and the owner of the two-story house in which the alleged sexual molestations occurred, testified for the defense. He testified that, in April of 2004, defendant moved into one of the two bedrooms in the basement of his house on Penn Street in Providence. According to Victor, defendant's bedroom included a "bed, a chair, a closet and [a] TV." He testified that he and his wife and their two children were living on the first floor during the period when the alleged incidents took place.

Victor further testified that defendant saw Rick, Oliver, and Wallace every two weeks on Saturdays; he stated that all three boys would stay at the house for "about an hour." On cross-examination, he testified that he worked from seven in the morning until noon on Saturdays; and he conceded that, for that reason, he was not continuously present when defendant's children would visit his house. When asked if he saw defendant in the basement with the children, he replied: "Yes, but not that much. * * * Sometimes one would go down, or two, but not the whole group." It was Victor's testimony that he never saw anything inappropriate take place between defendant and Rick.

### 7. The Testimony of Defendant

The defendant, Oscar Muralles, took the stand in his own defense. He denied that he had ever touched Rick or asked or forced him to touch his penis or to perform oral sex on him; he also denied that he had ever anally penetrated Rick. He further testified that Rick, Oliver, and

Wallace were in his basement apartment "very little;" but he did acknowledge that, during the course of the visits, there were times when only one of the boys was in the basement with him.

According to defendant, he separated from Danielle in 2002 because he would return from work to find their home "dirty" and also because he had "found her with another guy in [his] bed." It was further defendant's testimony that Danielle was "mad" at him for two reasons: first, because he had rebuffed a reconciliation request that she had made as he was driving her to visit her then-boyfriend, who was in jail; and, second, because he and his girlfriend had chosen to give their baby the same first name as that of Danielle's youngest son.

## II

### Standard of Review

When ruling on a motion for a new trial, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Barrios, 88 A.3d 1123, 1128 (R.I. 2014) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013); State v. Paola, 59 A.3d 99, 104 (R.I. 2013). In carrying out that role, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Morales, 895 A.2d 114, 121 (R.I. 2006). Upon the conclusion of this three-step process, if the trial justice "agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012) (internal quotation marks omitted). If the trial justice "does not agree with the jury verdict or

does not agree that reasonable minds could differ," then he or she must embark on a fourth analytical step in order to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (internal quotation marks omitted); State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011); see State v. Adefusika, 989 A.2d 467, 480 (R.I. 2010).

This Court has previously stated that, with respect to a trial justice's ruling on a motion for a new trial, the "record should reflect a few sentences of [his or her] reasoning on each point." State v. Hie, 93 A.3d 963, 975 (R.I. 2014) (quoting State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010)). The trial justice need not, however, "refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Robat, 49 A.3d at 71 (emphasis in original) (internal quotation marks omitted); see State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012).

We accord "great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Robat, 49 A.3d at 71 (internal quotation marks omitted). When reviewing the denial of a motion for a new trial, "we do not focus on whether this Court simply agrees or disagrees with the trial justice's credibility determinations," but rather we are "deferential to those determinations." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (quoting State v. LaPierre, 57 A.3d 305, 311 (R.I. 2012)). We apply such a "deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" Paola, 59 A.3d at 104 (quoting State v. Texieira, 944 A.2d 132, 141 (R.I. 2008)). Accordingly, this Court will not disturb a trial justice's decision on a motion for a new trial unless "the trial justice committed clear error or * * * he or she overlooked or misconceived

material and relevant evidence [relating] to a critical issue in the case." DiCarlo, 987 A.2d at 871 (internal quotation marks omitted); see also State v. Payette, 38 A.3d 1120, 1127 (R.I. 2012).

## III

### Analysis

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial due to what he characterizes as a lack of credibility on the part of the complaining witness (Rick) and his half-brother (Oliver) and inconsistencies in their testimonies concerning the alleged molestations. The defendant sets forth various categories of what he asserts are "deficiencies" that the trial justice overlooked at trial—notably: (1) Rick's "memory loss;" (2) the "internal inconsistencies" in Rick's testimony; (3) the testimonies of Rick and Oliver being inconsistent with each other; and (4) the "implausibility" of the sexual molestation allegations.[5] It is further defendant's contention that the trial justice erred in attributing the alleged "flaws" in the testimony of Rick and Oliver to "unsharpened questioning by the attorneys, as well as the teenagers' apparent embarrassment and 'educational or learning shortcomings.'"

After carefully reviewing the record, it is clear to us that the trial justice, in his role as the proverbial thirteenth juror, made comprehensive findings, which served as the basis for his denial of defendant's motion for a new trial. In ruling on that motion, he carried out the required

---

[5]     We are entirely unpersuaded by defendant's contention that the sexual molestation allegations amount to an "implausibility" in that the testimonies of Rick and Oliver are "replete with logistical impossibilities." After perusing the record, we are of one mind with the state to the effect that nothing about the size or the layout of the basement, the timing of the visits, and the presence of other adults in the house "rendered it improbable, let alone impossible, that [defendant] molested [Rick]." The defendant's contention in this regard does not merit further discussion.

three-step analysis.  See State v. Lopez, 129 A.3d 77, 84 (R.I. 2016); Gonzalez, 56 A.3d at 104; Adefusika, 989 A.2d at 480.

With respect to the first step in the analysis, the trial justice considered the evidence in light of the jury charge; he noted that Oliver's testimony "corroborat[ed]" Rick's testimony regarding some of the alleged incidents of molestation.  See Gonzalez, 56 A.3d at 104. Specifically, the trial justice stated that "[Oliver] was able to peek into the [bed]room and see what the defendant was doing with [Rick,] * * * [and later] recounted the fondling and the fellatio that he saw."  He remarked that "[t]his was one of the few cases where there was evidence" (viz., Oliver's "eyewitness testimony") that corroborated the victim's testimony.

Next, the trial justice completed the second analytical step by independently assessing the credibility of the witnesses and weighing the evidence.  See Hie, 93 A.3d at 976.  He preliminarily characterized the testimony of Rick and Oliver as follows: "Both boys were hesitant and a bit embarrassed in their testimony, and there were a few educational or learning shortcomings."  He also took into account the purported inconsistencies in the boys' testimonies, stating that, "[i]n large part, some of th[e] answers that they gave may have seemed reticent or a bit unsharpened, because both counsel were asking questions in confusing or compound fashion."  Eventually, the trial justice expressly stated:

> "[S]ince they disclosed the unsavory events to their mother in 2008, they have never wavered from their report that the defendant sexually molested [Rick].  They have been steadfast in those accusations."

From his vantage point as a "front-row observer" at the trial, the trial justice concluded: "There was no way * * * that these youngsters fabricated the accusations."  Significantly, the trial justice found Rick and Oliver to have been "articulate and specific enough," and "totally guileless." The trial justice rejected outright "any suggestion that the boys' mother * * * prevailed on them,

or overbore their will and somehow prompted them to lie about the accusations." He reasoned that Danielle was financially dependent on defendant and that, accordingly, it would not have been in her interest to have her sons make false accusations against him. In so concluding, the trial justice expressly made credibility determinations and weighed the evidence. Accordingly, we reject defendant's argument that the trial justice "erroneously[] disregard[ed]" Danielle's "potential motives" to promote false accusations.

As for the third step in his analysis, the trial justice expressed satisfaction with the jury's verdict. He determined that "the jury carefully evaluated all the testimony and came to the proper conclusion." And he proceeded to explicitly declare: "I would have made the same determinations [as the jury] and found the defendant guilty beyond a reasonable doubt of the molestation charges, and [on] all of them." See State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007) ("If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied.").

After carefully reviewing the record, we are of the opinion that defendant's various arguments on appeal essentially amount to nothing more than a disagreement with the trial justice's assessment of the credibility of the witnesses and the weight of the evidence. In view of the verdict, the trial justice inferred that the jury disbelieved defendant—and he agreed with the jury's credibility determinations. In partial explanation of his reasoning, the trial justice referred to this Court's decision in State v. Mattatall, 603 A.2d 1098 (R.I. 1992). In that case, we observed that a defendant who elects to testify at trial "runs the very real risk that if disbelieved,

the trier of fact may conclude that the opposite of his testimony is the truth." Id. at 1109.[6] In addition, as we have previously stated, the "fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Jimenez, 33 A.3d 724, 738 (R.I. 2011) (internal quotation marks omitted); see Gonzalez, 56 A.3d at 103.

Even if it were to be conceded arguendo that there were actual testimonial inconsistencies between the testimonies of Rick and Oliver, that would not "preclude a determination that the witnesses were credible." Lopez, 129 A.3d at 85; see State v. Rosario, 35 A.3d 938, 948 (R.I. 2012); see also State v. Jensen, 40 A.3d 771, 781 (R.I. 2012) (recognizing that "the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief"). It is often the case that "[p]ercipient witnesses * * * differ concerning some details about events in which they had some degree of involvement." Lopez, 129 A.3d at 85. As always, we remain deferential[7] to the trial justice, who is present "during all phases of the trial" and, accordingly, is "in an especially good position to * * * judge the credibility of the witnesses." Texieira, 944 A.2d at 141.

---

[6]    The trial justice quoted the following language from State v. Mattatall, 603 A.2d 1098 (R.I. 1992):

> "As long as there exists some other evidence of the defendant's guilt, disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt. * * * A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." Id. at 1109 (internal quotation marks omitted).

[7]    Our deference in this regard is never unthinking or automatic, but we are nonetheless ever mindful that it was the trial justice who was physically present at the trial and accordingly could "experience firsthand the delivery and demeanor of a witness's testimony." State v. Paola, 59 A.3d 99, 106 (R.I. 2013) (quoting State v. Ferreira, 21 A.3d 355, 366 (R.I. 2011)).

- 14 -

Having thoroughly reviewed the entire record as well as the decision denying the motion for a new trial, we are satisfied that the trial justice conducted the proper three-step analysis in passing upon the defendant's motion. Nothing in the record leads us to conclude that the trial justice either clearly erred or overlooked or misconceived relevant evidence. Accordingly, we hold that the trial justice properly denied the defendant's motion for a new trial.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record may be returned to that tribunal.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Oscar Muralles. |
| **Case Number** | No. 2015-129-C.A.<br>(P1/10-998A) |
| **Date Opinion Filed** | February 28, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Angela M. Yingling<br>Office of the Public Defender |