December 2, 2021

**Supreme Court**

No. 2020-57-C.A.
(P1/13-3759A)

State                    :

    v.                   :

Cesar Vazquez.           :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email    opinionanalyst@courts.ri.gov,    of    any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Cesar Vazquez. | : | |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Cesar Vazquez, was convicted following a jury trial on four counts of first-degree child molestation sexual assault. He was sentenced to four concurrent terms of forty-five years imprisonment, with thirty years to serve and the balance suspended, with probation.

On appeal, defendant contends that the trial justice erred by denying his motion for a new trial because, defendant argues, the trial justice overlooked material evidence. The defendant maintains that this error entitles him to have his conviction vacated and to be granted a new trial. After careful consideration of defendant's arguments and a thorough review of the record, we affirm the judgment of conviction and the denial of defendant's motion for a new trial.

# I

## Facts and Travel

The complaining witness, Jane, was born in 1990.[1]  In May 2013, Jane revealed to her mother and aunt that defendant had sexually assaulted her on several occasions when she was a child.  A short while later, Jane went to the Pawtucket police station and filed a police report containing allegations against defendant.

On December 12, 2013, a grand jury returned a five-count indictment against defendant.  Counts one and three alleged first-degree child molestation sexual assault in the form of digital/vaginal penetration, in violation of G.L. 1956 § 11-37-8.1; counts two and four alleged first-degree child molestation sexual assault in the form of penile/vaginal penetration, in violation of § 11-37-8.1; and count five alleged third-degree sexual assault, in violation of § 11-37-6.  Count five was dismissed by the state prior to trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

A jury trial began on November 18, 2015, and concluded on November 23, 2015.  At trial, the state called four witnesses.  The defendant presented two witnesses.  The testimony given at trial revealed the following.

---

[1] We refer to the complaining witness and her half-sister by pseudonyms.

Jane is the daughter of Yanira Rentas, who separated from Jane's father when Jane was very young.[2] When Jane was around three years old, Yanira began dating defendant, who then continued to be in Jane's life for years. In 1996 defendant and Yanira had a child together, Jane's younger half-sister, Janelle. Jane described her initial relationship with defendant as "normal[,]" although she also stated that, when living with defendant, Yanira, and Janelle, she felt like a "bonus child[.]" However, eventually the nature of her relationship with defendant drastically changed because, as Jane testified, defendant sexually assaulted her on two occasions during her childhood.

According to Jane, the first incident, encompassing counts one and two of the indictment, occurred on an unspecified date in early 2000 while Jane was living with her mother, Janelle, and defendant in Pawtucket.

At the time, Jane was in elementary school, and her mother "worked a lot[.]" Jane testified that while her mother was working and Jane was not in school or after-school care, she was usually in the care of her grandmother. Jane stated, however, that on this particular occasion, she was watched in the family's home only by defendant, who was also caring for then-three-year-old Janelle. Jane testified that she began to doze while she, Janelle, and defendant were in her mother's bedroom watching a movie. She added that Janelle was running in and

_____

[2] We refer to members of the Rentas family by their first names for purposes of clarity. No disrespect is intended.

out of the bedroom, as if playing a game. Jane testified that, at one point, she heard the door to the bedroom close, leaving Janelle outside. According to Jane, defendant then got onto the bed with Jane and touched her under her shorts and underwear. Jane further testified that defendant then removed her shorts and underwear and put his fingers, and then his penis, into her vagina. According to Jane, after the incident, defendant threatened to kill her mother if she said anything, which left Jane feeling "[t]errified."

Jane also testified to a second incident, encompassing counts three and four of the indictment, which occurred on an unspecified date in late 2003 or early 2004.

Jane testified that the second incident took place in the apartment in Lincoln where she lived with her mother and Janelle; defendant did not live in the apartment because defendant and her mother had broken up by that time. Jane testified that the three of them lived in a second-floor apartment in a four-unit building with two units on each floor. Jane also testified that her aunt Sofia Rentas, her mother's sister, lived in the apartment next door.

Jane testified that the front door to the apartment building was often left unlocked and that the doors between the apartments on the second floor, which allowed Sofia access to the apartment Jane and her family lived in, were also unlocked during the day; the apartment doors could be open or closed depending

- 4 -

on various factors, such as her mother wanting to keep heat inside their apartment. However, Sofia testified at trial that the front door to the apartment building was kept locked, and Janelle testified that the doors between the apartments were always open.

Jane further testified that defendant often stopped by the Lincoln apartment and spent time with both Janelle and Jane—although, according to Jane, after the first incident of sexual assault she wanted to "not have to have interactions with [defendant] if not necessary."

Jane testified that, on the day of the second incident, defendant entered her bedroom in the Lincoln apartment, where she was sitting in a chair at her desk using her computer. Jane stated that defendant grabbed her arm, led her from the chair to the bed, pushed her onto the bed, covered her mouth with his hand, and removed her jeans and underwear. Jane testified that defendant then touched her vagina with his fingers and inserted his fingers, and then his penis, into her vagina. Jane testified that defendant then left the room. According to Jane, after the second incident she felt "hurt[,]" "betrayed[,]" and "broken."

Jane stated that, after the incidents occurred, she did not want to continue a relationship with defendant and often refused to spend time with him, although sometimes her mother required her to do so. Jane also acknowledged that she

appeared in various photographs with defendant that were taken after the incidents occurred; according to Jane, she did so "to keep everything appearing normal."

Jane testified to various rationales for delaying her disclosure of the incidents. Jane stated that shortly after the second incident she was "terrified" and "scared of what would happen if [she] told[.]" She testified that she "was scared of [defendant], especially after he threatened [her]." She also stated that she was worried that even if she revealed the incidents, they would be "brushed under the rug," and she would still be required to see defendant. Jane further testified that she did not disclose as time went on because she had "built a life" and she "didn't want it crashing down." She also stated that she did not "want to relive what had happened[,]" nor to "hurt family members"—she simply "wanted to leave things as they were."

However, eventually Jane did disclose the abuse. Both Jane and her fiancé, Andrew Sabourin, testified that Jane had disclosed general information about the assaults to Sabourin, her then-boyfriend, in 2011. She then disclosed the incidents to others in May 2013—first to her aunt Yanitza Rentas, then to her mother, and finally to the police.

Both Jane and Sabourin testified that Sabourin insisted that Jane disclose the incidents of molestations, and that Jane ultimately did so. Jane and Sabourin both testified that, because of the incidents' traumatic effect on Jane, she did not allow

any man other than Sabourin to watch their daughter. This included one occasion when Jane was at work and Sabourin needed to leave home for a job interview; Jane did not allow their daughter to be left with Sabourin's own father. Jane testified that, because of the impact of this rule on her and Sabourin's relationship, as well as on her relationship with members of both their families, Sabourin gave Jane an ultimatum: either reveal the incidents to her family or possibly end the relationship.

In his closing argument, defense counsel suggested that the true motivation for Jane's allegations was not Sabourin's ultimatum, but, rather, Jane seeking vengeance on defendant for punishing Janelle. Janelle had testified that, sometime between 2012 and 2013, defendant punished her for text messages referencing drugs and alcohol that he had found on her cell phone. Janelle stated that her punishment included both having her telephone taken away and being told not to associate with certain people, including Jane. According to Janelle, she told Jane about the punishment in January 2013, shortly after it happened. However, Jane testified that she did not know exactly when Janelle's telephone was taken away, nor did she know who had inflicted the punishment.

On November 23, 2015, the jury returned a verdict of guilty on all four remaining counts. On December 1, 2015, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, asking the

trial justice to vacate the judgment of conviction. The motion was heard before the trial justice on December 7, 2015. The trial justice denied the motion for a new trial in a bench decision rendered on the same day. On January 25, 2016, the trial justice sentenced defendant. The defendant filed a premature notice of appeal on January 25, 2016, and a judgment of conviction was ultimately entered on June 30, 2016, placing defendant's appeal properly before us. *See Butler v. Gavek*, 245 A.3d 750, 753 n.1 (R.I. 2021) (noting that a notice of appeal filed prematurely will be treated "as if it had been timely filed after judgment was entered") (quoting *Sullivan v. Coventry Municipal Employees' Retirement Plan*, 203 A.3d 483, 486 n. 4 (R.I. 2019)).

## II

### Standard of Review

The defendant has raised as the sole issue on appeal the propriety of the trial justice's denial of his motion for a new trial. As we have repeatedly held, when a trial justice considers a motion for a new trial after a jury trial, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Gumkowski*, 223 A.3d 321, 328 (R.I. 2020) (quoting *State v. Johnson*, 199 A.3d 1046, 1050-51 (R.I. 2019)).

A trial justice considering a motion for a new trial after a jury trial "must undertake a three-step analysis: (1) consider the evidence in light of the jury

charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Vidot*, 253 A.3d 401, 409 (R.I. 2021) (quoting *State v. Stokes*, 200 A.3d 144, 152 (R.I. 2019)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Johnson*, 199 A.3d at 1051). "Only when the trial justice does not agree with the jury's verdict, must he or she embark on a fourth analytical step." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

Ultimately, "[t]his Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Vidot*, 253 A.3d at 409 (brackets omitted) (quoting *Johnson*, 199 A.3d at 1051). Thus, "[i]f the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconstrued material evidence or was otherwise clearly wrong." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

## III

## Discussion

On appeal, defendant contends that the trial justice was clearly wrong when she denied his motion for a new trial because, defendant argues, she overlooked critical material evidence. Specifically, defendant argues that the trial justice did not consider evidence of internal inconsistencies in Jane's testimony, evidence of contradictions to Jane's testimony, the purported implausibility of Jane's allegations, and evidence of Jane's motivation to fabricate allegations against defendant.

The defendant points to the following purported inconsistencies in Jane's testimony as material evidence that the trial justice overlooked: (1) that Jane initially alleged, in her police statement, that the first incident began while she was asleep and with the bedroom door closed, but she testified at trial that it occurred while she was awake and watching television and began when the bedroom door was open; (2) that Jane initially told police that the second incident occurred when she was lying on her bed watching television, but she testified at trial that it occurred while she was on a chair at her desk using her computer; (3) that, before the grand jury, Jane did not testify to digital penetration occurring during the second incident, whereas she did at trial; and (4) that Jane varied in her reasons for delaying disclosures of the incidents.

The defendant further argues that the trial justice ignored evidence of contradictions to Jane's testimony and that such evidence was material. Specifically, defendant contends that the trial justice ignored photographic and testimonial evidence that Jane continued a relationship with defendant after the incidents occurred, when Jane testified that she did not. Also, defendant points to several contradictions between Jane's testimony and the testimony given by other witnesses as to the characteristics of the apartment in Lincoln where the second incident occurred. For example, defendant contends that, although Jane testified that her mother's bedroom was in the attic, her mother testified that the attic was used only for storage. The defendant also notes that, although Jane testified that she was left alone in the apartment, other witnesses testified that her aunt Sofia frequently checked on her in the apartment, and that, although Jane testified that the front door to the building was left unlocked, other witnesses testified that it was kept locked.

The defendant also alleges that the trial justice impermissibly overlooked what defendant refers to as the "entirely implausible" nature of Jane's testimony. The defendant specifically points to: (1) Janelle's alleged presence in the home during the first incident, despite defendant being described by some witnesses as a "good dad"; (2) defendant entering the apartment building on the day of the alleged second incident despite some witnesses testifying that the front door was always

- 11 -

locked; (3) the alleged occurrence of the second incident despite the possibility of Jane's aunt Sofia and others easily entering the apartment; (4) no family members suspecting that anything unusual was occurring between defendant and Jane; (5) Jane being willing to leave Janelle alone with defendant; and (6) only two alleged incidents occurring, despite defendant having continued access to Jane.

Lastly, defendant avers that the trial justice erred by overlooking evidence of Jane's motive to lie. The defendant contends that Jane had a motive to fabricate her claims because she was angry at defendant for his punishment of Janelle, which stopped Janelle from communicating with Jane. The defendant argues that the timing of Jane's disclosure—allegedly a few months after defendant punished Janelle and while the punishment was ongoing and years after the assaults themselves took place—was strong evidence of Jane's motivation to lie.

In issuing her decision, the trial justice began by articulating the correct standard for assessing a motion for a new trial, stating that she was required to act as a "thirteenth juror" and to "exercise[] independent judgment on the credibility of witnesses and on the weight of the evidence." *Gumkowski*, 223 A.3d at 328 (quoting *Johnson*, 199 A.3d at 1050-51). She also correctly indicated that her process could be either three or four steps, depending on whether she agreed with the jury's verdict. *See Vidot*, 253 A.3d at 409 (noting that a trial justice's review of

- 12 -

a motion for a new trial involves at least three steps, and, when the trial justice does not agree with the jury's verdict, the review involves four).

The trial justice then carried out each analytical step in a proper analysis of a motion for a new trial. First, she considered the evidence in light of the instructions to the jury: She stated each charge for which defendant had been convicted, discussed the jury instructions given for each charge, and then assessed the evidence in light of those specific charges. Next, she considered the credibility of each major witness. Finally, the trial justice found that, in the instant case, her analysis "ended without applying the final step because if [she had] been sitting on this case without a jury, [she] would have issued the identical verdict reported by the jury[,]" thus completing the final step.

Because in this case the trial justice "applied the correct standard for assessing the motion for new trial and articulated sufficient grounds for denying the motion[,]" her denial is "entitled to great weight and deference[.]" *Johnson*, 199 A.3d at 1051.

We note that a "trial justice is not required to 'refer to *all* of the evidence in supporting the decision.'" *State v. Ogoffa*, 159 A.3d 1043, 1049 (R.I. 2017) (brackets omitted) (quoting *State v. Muralles*, 154 A.3d 925, 932 (R.I. 2017)). Instead, a trial justice must only "refer to enough to allow this Court to determine whether or not [she] conducted the appropriate analysis." *Id.* at 1051. Thus,

- 13 -

although here the trial justice did not discuss every purported inconsistency, contradiction, or implausible allegation, she correctly applied the standard for a motion for a new trial and articulated sufficient reasoning; therefore, her determinations are given due deference. *See id.* (acknowledging that the "trial justice did not discuss every inconsistency or improbable fact that defendant alleges[,]" but nevertheless, that the trial justice did not commit clear error in denying a motion for a new trial).

Ultimately, defendant's contentions with respect to the alleged inconsistencies in Jane's testimony, the purported contradictions to Jane's testimony, the supposedly implausible nature of Jane's claims, and Jane's alleged motive to fabricate her allegations all hinge on the question of Jane's credibility. As the trial justice stated at the outset of rendering her analysis of the evidence, "[t]his was a case of credibility, pure and simple." And, ultimately, the trial justice found Jane to be a "reliable[,] credible witness on material issues." The trial justice stated that Jane's testimony regarding how she had taken "control over her life rang true[.]" This determination of Jane's credibility by the trial justice is entitled to due deference.

Importantly, we also note that Jane's credibility was not necessarily tarnished by the purported inconsistencies and contradictions that defendant has pointed to. The alleged inconsistencies in Jane's testimony describing the first and

- 14 -

second incidents are explained by the differing level of detail of her testimony at different stages—as the trial justice pointed out, at trial Jane "described in detail" the incidents,  whereas her police statement recounting both incidents was less than two pages long.   As we have previously stated, "the existence of some inconsistencies in a witness's testimony does not 'preclude a determination that the witness was credible.'" *Ogoffa*, 159 A.3d at 1051 (brackets omitted) (quoting *State v. Lopez*, 129 A.3d 77, 85 (R.I. 2016)).

In addition, some of the purported inconsistencies and contradictions are not necessarily inconsistent or contradictory at all.  In rendering her decision, the trial justice stated that she believed that during the first incident Jane was "sleepy" and "half dozing[,]" a state not inconsistent with Jane's assertions both that she was awake and that she was asleep.  The trial justice also reconciled the photographs showing Jane and defendant together after the incidents with Jane's testimony that she did not have a relationship with defendant after the incidents by stating that "[t]he [c]ourt, and likely the jury, understood that [Jane] went on with her life as a child and as a teenager making the best of it.  The jury would not have expected her to totally isolate herself from her family and extended family.  This was her life."   Thus, the existence of the photographs, which the trial justice clearly considered, does not necessarily contradict Jane's testimony; rather, it highlights Jane's precarious position as a child who did not want to continue a relationship

- 15 -

with defendant, but who wanted to maintain the appearance of normality and to make the best she could out of a horrific situation.

The trial justice also determined that other witnesses were credible and found that their testimony "clearly supported [Jane's] version of events." Specifically, the trial justice found that Sabourin, Jane's fiancé, was an "excellent" and "very credible" witness who "presented very compelling testimony that totally corroborated" important elements of Jane's testimony.

By contrast, the trial justice determined that defendant's main witness, Janelle, was not credible. The trial justice found that Janelle's testimony "did not have a ring of truth to it[,]" noting that she had "an interest in the outcome of the case." Ultimately, the trial justice found that Janelle was "neither credible as a witness, nor was her testimony reliable."

Additionally, despite defendant's contentions to the contrary, the trial justice considered the evidence that defendant claims points to Jane's motive to lie. However, the trial justice found that this evidence was not compelling. She determined that there was no testimony that placed Janelle's punishment at the same time as Jane's disclosure of the incidents to her family and the police. The trial justice further found that "[Janelle]'s punishment was more of a non-event in [Jane]'s life than [d]efense counsel suggested[,]" and thus the evidence presented by defendant did not show that Jane had a strong emotional reaction toward the

punishment that would serve as an impetus to lie about defendant. Instead, the trial justice believed Jane and Sabourin's testimony as to the motivation behind the disclosure, which, according to the trial justice, they explained occurred because Jane "risked losing" Sabourin over her "rules" barring men other than Sabourin from watching their young daughter, a rule Jane implemented because of the trauma she had suffered as a result of the incidents of abuse. Ultimately, the trial justice considered defendant's proffered evidence to the contrary, but nevertheless stated that she "accepted [Jane] and [Sabourin]'s testimony as to why [Jane] disclosed when she did." Thus, the trial justice did not overlook material evidence of Jane's motive for disclosure.

Having thoroughly reviewed the record, including the trial justice's decision denying the motion for a new trial, we are satisfied that the trial justice articulated adequate grounds for denying the motion and that she did not overlook material evidence. Accordingly, we hold that the trial justice properly denied the defendant's motion for a new trial.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record in this case may be returned to the Superior Court.

STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Cesar Vazquez. |
| **Case Number** | No. 2020-57-C.A. (P1/13-3759A) |
| **Date Opinion Filed** | December 2, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Virginia M. McGinn <br> Department of Attorney General <br> For Defendant: <br><br> Angela M. Yingling <br> Office of the Public Defender |