## STATE

### v.

### Robert E. PAYETTE.

### No. 2010–151–C.A.

Supreme Court of Rhode Island.

March 14, 2012.

Jane M. McSoley, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice Indeglia, for the Court.

The defendant, Robert E. Payette (defendant or Payette), appeals from a Superior Court judgment of conviction for first-degree murder, for which he received a sentence of life imprisonment. On appeal, Payette contends that the trial justice erred (1) by instructing the jury that malice may be inferred where there is a disparity in the size or strength between the victim and the defendant; and (2) by denying his motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The record reveals that the genesis of this murder was a $510 debt. According to Payette's statement to the police, on the evening of November 10, 2007, he invited the victim, Ronald Dufour (Mr. Dufour), to Payette's West Warwick apartment for a late night pasta dinner with Payette and his girlfriend, Judith Parente (Ms. Parente).[1] Payette's intention was to talk Mr. Dufour into paying Ms. Parente the $510 that he owed to her and had been refusing to repay. According to Payette, Mr. Dufour was drunk at the time Payette extended the invitation; he said that his purpose in feeding Mr. Dufour prior to discussing the debt was "to sober him up a bit." During dinner, at which Payette drank a pint-and-a-half of brandy, Mr. Dufour became combative and began "running his mouth." After he struck Payette's dog, he was asked to leave the apartment. While escorting Mr. Dufour from the apartment, Payette grabbed a steak knife because, he explained, he "was a little bit in fear" and because "people are stupid."

According to Payette, while he was standing outside of the building with Mr. Dufour in an effort to "talk sense into him," Mr. Dufour attempted to punch Payette in the face[2] and grabbed his coat. Although Payette tried to free himself from Mr. Dufour's grip and kept telling him to "let go," he was unsuccessful in separating himself from Mr. Dufour's grasp. Payette recalled that "after [Mr. Dufour] swung one too many times[,] that was it. * * * I snapped. * * * I pulled the knife out." While Mr. Dufour was in a standing position, Payette stabbed him in the chest "multiple times." Payette recalled that, despite his wounds, Mr. Dufour remained on his feet, maintained his grip on Payette's coat, and continued throwing punches. Payette then cut Mr. Dufour's throat, finally causing him to fall to the ground.

Payette admitted to then dragging Mr. Dufour's body down a wooded embankment behind his apartment. While doing so, Payette and Mr. Dufour's body fell into a large hole. After unsuccessfully attempting to pull Mr. Dufour's body out of the hole, Payette covered it with debris. Payette then put his own bloody clothing

---

1. Payette and Ms. Parente shared the apartment with Delo Repose, who was at work and out of the apartment at the time.

2. Payette stated to the police that he could not recall with certainty whether Mr. Dufour's punches actually struck him.

into plastic bags and threw them into a dumpster in the parking area of his apartment complex. He also attempted to clean up the blood stained pavement outside his residence with buckets of hot water and bleach.

Soon after the incident, Payette called his and Ms. Parente's mutual housemate, Delo Repose (Mr. Repose), who was working at the time, and asked him to come home immediately. At trial, Mr. Repose testified that because it was his first day at his new job as a dishwasher, he waited until his shift ended at approximately 10:45 p.m. before leaving. Upon arriving home shortly thereafter, Payette told him of his killing of Mr. Dufour. Payette then showed Mr. Repose where in the parking lot he stabbed Mr. Dufour, pointed out where he disposed of his body, and told him how he discarded his own bloody clothes into the dumpster.

Mr. Repose testified that the two men then decided to walk together to a bar approximately one to two miles from their apartment. After walking back to their apartment, they watched a movie together and spoke about what steps might be taken to conceal evidence of the crime. Mr. Repose stated that the pair discussed setting the dumpster on fire, scouring the bloodstained parking lot surface, and throwing Mr. Dufour's body into the nearby river; however, they ultimately did nothing in addition to what Payette had already done to conceal the evidence of the murder that night.

Mr. Repose added that when he awoke the next morning, Payette and Ms. Parente were attempting to scrub the bloodstains off the pavement with water, cleaning solution, and a broom. Later that afternoon, Mr. Repose told his housemates that he was going to dinner with his daughter; but, instead, she drove him to the Rhode Island State Police Headquarters in Scituate—where Mr. Repose revealed to the state police what he knew about the murder.

Later that night, November 11, 2007, Payette was arrested at his apartment. On January 29, 2008, a Kent County grand jury indicted Payette for murder in violation of G.L.1956 § 11–23–1.[3] He was then tried in the Superior Court for Kent County before a jury in September 2009. On September 15, 2009, after a six-day trial, the jury returned a verdict of guilty of murder in the first degree. The trial justice denied Payette's motion for a new trial on October 16, 2009. On November 10, 2009—the second anniversary of the murder—the trial justice imposed a life sentence. Payette filed a timely notice of appeal to this Court.

## II

### Discussion

#### A

#### Jury Instructions

On appeal, Payette contends that the trial justice committed reversible error when he instructed the jury that malice may be inferred where there is a disparity in the size or strength between a victim and a defendant. According to Payette, while disparate size and strength between a victim and a defendant may be a proper jury instruction in limited circumstances, the case at bar does not qualify as one of those circumstances. Furthermore, Pay-

---

**3.** General Laws 1956 § 11–23–1 states in pertinent part:

"The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree."

ette avers that the instruction given likely confused the jury to his prejudice.

### 1

### Standard of Review

◼ "We undergo a review of jury instructions on a *de novo* basis." *State v. Cipriano*, 21 A.3d 408, 423 (R.I.2011) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I.2009)). "It is well established that, '[o]n review, we examine [jury] instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them.'" *Id.* (quoting *Ros*, 973 A.2d at 1166). "[This Court] shall affirm a trial justice's jury instructions when * * * the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *Id.* (quoting *State v. Linde*, 876 A.2d 1115, 1128 (R.I.2005)). Further, "this Court will not examine a single sentence apart from the rest of the instructions, but rather 'the challenged portions must be examined in the context in which they were rendered.'" *Ros*, 973 A.2d at 1166 (quoting *State v. Ibrahim*, 862 A.2d 787, 796 (R.I.2004)). "The trial justice need not use particular words in the instruction, but must 'correctly state[ ] the applicable law.'" *Cipriano*, 21 A.3d at 423 (quoting *State v. Imbruglia*, 913 A.2d 1022, 1030 (R.I.2007)). Finally, "an incorrect charge warrants reversal only if a jury could have been misled to the prejudice of the complaining party." *Ros*, 973 A.2d at 1166 (quoting *State v. Graham*, 941 A.2d 848, 855 (R.I.2008)).

### 2

### Analysis

Payette argues that the trial justice erred when he instructed the jury that malice may be inferred when there is a disparity in the size or strength between a victim and a defendant. At issue is the following portion of the trial justice's instructions to the jury:

"Malice is an essential element of first as well as second degree murder. Malice may be express or implied. An act is committed with malice when it is committed with wanton disregard for the probability of death or great bodily harm. Malice can arise from either an expressed intent to kill or to inflict great bodily harm, or it may be implied from wanton recklessness and an extreme indifference to the sanctity of human life.

"Express malice may be based upon a subtle design against a victim, and it may be implied or inferred from all the circumstances, including the means by which death was brought about. *Malice may also be inferred from circumstances where there is a disparity in size or strength between the victim and the defendant.* Malice aforethought is the conscious design or intent to kill; that is to say that before killing his victim, the defendant thought about doing it and he thereafter acted upon that thought. That conscious intent or design to kill, however, must have existed in the defendant's mind for more than a mere moment's duration in order to prove first[-]degree murder." (Emphasis added.)

At the end of the trial justice's instructions during a side-bar conference outside the presence of the jury, defense counsel objected to that part of the instructions that allowed an inference to be drawn from a disparity in size and strength. The trial justice noted, but overruled, defense counsel's objection.

On appeal, Payette argues that the instruction given "was wholly improper" and failed to conform to Rhode Island law. To support his contention, Payette argues that the facts presented at trial about the

disparity in size and strength between he and Mr. Dufour were simply insufficient to justify the trial justice giving such an instruction. During trial, the jury heard evidence that at the time of his arrest, Payette was forty-four years old and weighed 163 pounds; at the time of his death, Mr. Dufour was sixty-six years old and his body weighed 147 pounds. Payette avers that this twenty-two-year/sixteen-pound difference was insufficient to allow the trial justice to charge the jury as he did. While acknowledging that Rhode Island law has recognized that a disparity in size and strength may be considered by a jury to infer malice, Payette asserts that our prior cases limit this consideration only to circumstances involving the killing of very young children by adults.[4] Payette further cites a number of cases from other jurisdictions holding that size and strength disparity are relevant in determining malice when the victims were either children or elderly.[5]

Although it is true that many cases relying on this principle do involve children or elderly victims, this Court has never limited this legal doctrine to such victims, nor are we constrained to do so today. To the contrary, in *State v. Oliveira*, 774 A.2d 893, 923 (R.I.2001), this Court cited our holding in *State v. McGranahan*, 415 A.2d 1298, 1303 (R.I.1980)—that "[m]alice can * * * be inferred from circumstances where there is a disparity in size and strength between the victim and an assailant"—in affirming an adult's conviction for assault with intent to murder another adult.

Other jurisdictions have also inferred malice from evidence of a disparity in size and strength between adults. In *Com-*

*monwealth v. Moore*, 488 Pa. 361, 412 A.2d 549 (1980), the Supreme Court of Pennsylvania affirmed a conviction of third-degree murder after holding that sufficient evidence was presented from which to infer malice. In *Moore*, 412 A.2d at 551, the defendant, at six feet two inches tall and approximately 180 pounds, was "over one-half foot taller and twenty pounds heavier than the victim." This disparity was viewed by that court as a factor "relevant to the question of malice." *Id.* (quoting *Commonwealth v. Dorazio*, 365 Pa. 291, 74 A.2d 125, 130 (1950)). The *Moore* court based its decision on the earlier Pennsylvania case of *Commonwealth v. Buzard*, 365 Pa. 511, 76 A.2d 394 (1950)—the facts of which are similar to the case at bar. In *Buzard*, 76 A.2d at 398, the Supreme Court of Pennsylvania affirmed a conviction of second-degree murder, the cause of which was a thirty-one-dollar debt. The *Buzard* court viewed an approximately eight-inch/forty-five-pound disparity between the adult defendant and the adult victim as a factor in favor of inferring malice. *Buzard*, 76 A.2d at 395, 396.

■ This issue has also been considered by courts in Texas and Virginia. In *Sadler v. Texas*, 364 S.W.2d 234, 237–38 (Tex. Crim.App.1963), the Texas Court of Criminal Appeals affirmed a murder conviction while holding that "the jury had * * * evidence from which they found an intention to kill, considering the relative [disparity in] size, weight and strength * * *" of the adult defendant and adult victim. Similarly, in *Beavers v. Commonwealth*, 245 Va. 268, 427 S.E.2d 411 (1993), the Supreme Court of Virginia affirmed a mur-

---

**4.** *See, e.g., State v. Wilding*, 638 A.2d 519, 522 (R.I.1994) and *State v. McGranahan*, 415 A.2d 1298, 1303 (R.I.1980).

**5.** *See, e.g., People v. Brackett*, 117 Ill.2d 170, 109 Ill.Dec. 809, 510 N.E.2d 877 (1987); *Peo-*

*ple v. Drumheller*, 15 Ill.App.3d 418, 304 N.E.2d 455 (1973); *State v. Morris*, 564 S.W.2d 303 (Mo.Ct.App.1978); *State v. Cook*, 557 S.W.2d 484 (Mo.Ct.App.1977); *Patrick v. State*, 906 S.W.2d 481 (Tex.Crim.App.1995).

der conviction in which a nineteen-year-old defendant, weighing 205 pounds, killed his sixty-year-old neighbor, who weighed 175 pounds. In its holding, the court held that "[a] jury may also consider * * * the disparity in size, strength, and age between the victim and the accused * * * in considering the issue of intent to kill." *Id.* at 421 (citing *Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882, 892 (1982)). Therefore, considering the foregoing authority, we hold that Payette's attempt to limit the principle of inferred malice only to cases in which adults kill young children or the elderly is improper.

▬ In the case at bar, the jury was presented with sufficient evidence about the age and physical disparity between Payette and Mr. Dufour to justify the instruction given. *Cf. State v. Drew*, 919 A.2d 397, 404 (R.I.2007) (holding that a trial justice should not issue an instruction that is not supported by the evidence). Such evidence included the aforementioned weight and age difference,[6] as well as the state medical examiner's testimony that Mr. Dufour was in an overall "unhealthy condition,"[7] and, at the time of his death,

had a blood alcohol level of 0.152 percent.[8] This evidence, properly admitted during trial, supported the trial justice's instruction on inferred malice from disparate size or strength.

Despite Payette's contentions, and although the disparity of size and strength here may not have been as extreme as an adult's killing of a young child, we hold that the instruction was a correct statement of law and was not improper.[9] In regard to Payette's assertion that the instruction likely confused the jury, we emphasize that when we review jury instructions for error, "we examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *Ibrahim*, 862 A.2d at 796 (quoting *State v. Kittell*, 847 A.2d 845, 849 (R.I.2004)). Because the record in the instant case reflects sufficient justification for the trial justice's instruction to the jury, and after considering the jury instructions as a whole, we conclude that the instruction at issue was not likely to cause confusion.[10]

---

6. We pause to note that G.L.1956 § 11–5–10 makes it a felony offense to "commit an assault and battery upon a person sixty (60) years of age or older * * *." This criminal statute reflects the heightened concern that the Legislature has for people sixty years old or older, regardless of any additional health infirmity.

7. It is uncertain whether Payette was aware that Mr. Dufour suffered from advanced coronary artery disease, as testified to by the medical examiner.

8. To give context to this figure, G.L.1956 § 31–27–2, which governs driving under the influence of liquor or drugs, reads in pertinent part as follows:
 "(a) Whoever drives or otherwise operates any vehicle in the state while under the influence of any intoxicating liquor * * * shall be guilty of a misdemeanor * * *.

 "(b)(1) Any person charged under subsection (a) of this section whose blood alcohol concentration is eight one-hundredths of one percent (.08%) or more * * * shall be guilty of violating subsection (a) of this section."

9. We note that the state's proposed jury instructions did not include any instruction on inferred malice from disparate size or strength.

10. Also included in Payette's appeal was a brief argument that the jury instruction "was tantamount to an impermissible comment on the evidence." We hold the jury instruction was an accurate statement of law, as discussed *supra*, and was devoid of any improper editorializing by the trial justice. Thus, Payette's contention in this regard is without merit.

## B

## Motion for a New Trial

Payette next argues that the trial justice committed reversible error by overlooking and misconceiving material evidence in denying his motion for a new trial. He contends that strong evidence was presented to suggest his capacity was "so severely impaired by the consumption of alcohol" that he was unable to form the specific intent necessary to commit murder. Highlighting certain evidence presented at trial, such as testimony regarding the alcohol and prescription drugs he had ingested, his intoxication, and his post-killing actions, Payette avers that his will "was so paralyzed by alcohol and drugs [that he was] incapable of forming any sane design to kill [the victim]." Thus, Payette asserts that the trial justice committed reversible error by denying his motion for a new trial.

## 1

## Standard of Review

 "When deciding whether to grant or deny a motion for a new trial, 'the trial justice acts as a thirteenth juror.'" *State v. Pineda*, 13 A.3d 623, 640–41 (R.I. 2011) (quoting *State v. Espinal*, 943 A.2d 1052, 1058 (R.I.2008)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* at 641 (quoting *Espinal*, 943 A.2d at 1058). "On appeal, this Court 'accord[s] great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling.'" *Id.* (quoting *Espinal*, 943 A.2d at 1058). "We will overturn the trial justice's decision only if we are convinced 'that the trial justice

committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case.'" *Id.* (quoting *Espinal*, 943 A.2d at 1058).

## 2

## Analysis

 Payette centers his challenge to the denial of his motion for a new trial upon the trial justice's finding that his level of intoxication failed to sufficiently diminish his capacity so as to negate his intent to kill Mr. Dufour. "A claim of diminished capacity will negate the specific intent charged only if the intoxication is found to be 'of such a degree as to completely paralyze the will of the [defendant], take from him the power to withstand evil impulses[,] and render his mind incapable of forming any sane design.'" *State v. LaCroix*, 911 A.2d 674, 679 (R.I.2006) (quoting *State v. Edwards*, 810 A.2d 226, 235 (R.I.2002)). Thus, Payette asserts that the court "clearly erred by overlooking and/or misconceiving material evidence in denying [his] motion for a new trial." We disagree.

In the instant case, the trial justice performed the required review and effectively pronounced his reasons for denying Payette's motion. He acknowledged that, despite the evidence of Payette's drinking on the night in question, there was also sufficient evidence to "find that [Payette] knew exactly what he was doing when he purposely killed [Mr.] Dufour." The trial justice recalled Payette's own statement to the police in which he said that at the time he invited Mr. Dufour to dinner, he was "fairly sober" compared to Mr. Dufour. The trial justice also considered as evidence of Payette's alertness the fact that he retrieved a steak knife from the kitchen prior to escorting Mr. Dufour from his

apartment.[11] He further explained his conclusion by referring to how Payette, after repeatedly stabbing Mr. Dufour, "had the presence of mind to drag him a substantial distance through the woods and into the ravine near the river." The court related that "one of the most powerful pieces of evidence" indicating Payette's clarity of mind was his conscientious effort to conceal the body with debris. Finally, the evidence of Payette's immediate attempt to clean the parking lot of blood and dispose of "various pieces of primarily bloody evidence" in the dumpster supported the trial justice's ruling and his determination that the jury "properly returned a verdict of first[-]degree murder."

There is nothing in the record that would indicate that the trial justice overlooked or misconceived any material evidence or otherwise clearly erred. We conclude that he properly performed the review required. Accordingly, we affirm his denial of the defendant's motion for a new trial.

## III

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

11. The trial justice also recalled specific testimony by Mr. Repose that indicated that Payette went so far as to retrieve a second steak knife, after the first knife he was using broke, to finish his depraved undertaking.