**Supreme Court**

No. 2015-354-C.A.

(P1/14-2042AG)

State                                   :

v.                                     :

Francisco Diaz.                 :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                          :

        v.                                     :

Francisco Diaz.                                :


Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Francisco Diaz, appeals from the

denial of his motion for a new trial following his April 17, 2015 conviction in Providence

County Superior Court on the following counts: (1) assault on Theodora Nunez with a dangerous

weapon, "to wit, a firearm," in a dwelling house with the intent to murder, in violation of G.L.

1956 § 11-5-4 (Count One); (2) assault on Jessica Nunez[1] with a dangerous weapon, "to wit, a

firearm," in a dwelling house with the intent to murder, in violation of § 11-5-4 (Count Two);

(3) discharge of a firearm while in the commission of a crime of violence, "to wit, assault with a

dangerous weapon," causing injury to Theodora, in violation of G.L. 1956 § 11-47-3.2(b)(2)

(Count Three); (4) use of a firearm while in the commission of a crime of violence, "to wit,

assault with a dangerous weapon" against Jessica, in violation of § 11-47-3.2(a) (Count Four);

---

[1]     Due to the fact that Jessica Nunez and Theodora Nunez (who is Jessica's mother) share
the same last name, we shall refer to them by their first names.  In so doing, we intend no
disrespect.

- 1 -

(5) carrying a pistol without a license, in violation of § 11-47-8(a) (Count Five); and (6) assault on Jessica with a dangerous weapon, "to wit, a knife," in violation of § 11-5-2 (Count Seven).[2] On appeal, the defendant contends that the trial justice erred in denying his motion for a new trial due to the alleged inconsistencies and inaccuracies in and between the testimonies of Jessica and Theodora.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

The charges against defendant stemmed from an incident involving Jessica and defendant's use of a knife in early April of 2014 and a shooting on April 23, 2014, in which Theodora, Jessica's mother, was injured. A trial was held on the six above-indicated charges over five days in April of 2015. We relate below the salient aspects of what transpired at that trial.

## A

## The Testimony at Trial

### 1. The Testimony of Jessica Nunez

Jessica Nunez testified that she and defendant had been in a relationship until two weeks before the April 23, 2014 shooting. She stated that defendant is the father of her ten-year-old son. It was her testimony that she and defendant separated because he "threatened [her] with a knife, saying that he would stab [her], slash [her] face." She then proceeded to testify in more

---

[2] The defendant was charged with the above-indicated charges by indictment. In addition, he was charged with one count which alleged that Mr. Diaz "being an alien, did purchase, own, carry, transport, or have in his possession or under his control a firearm[], in violation of [G.L. 1956] § 11-47-7" (Count Six). Count Six was dismissed before trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

detail about the incident that caused their separation. She stated that, two weeks before April 23, 2014, defendant picked her up from work and drove towards Foxwoods Casino in Connecticut. According to her testimony, defendant kept asking her questions about the previous night, when she "went out with [her] sister to buy an outfit." It was her testimony that, during the drive, she told defendant that she was "fed up;" she added that he then said that he "was going to jump off a bridge." She stated that she told defendant that she "no longer wanted to be with him" and that then "[defendant] said that he was going to drive [them] off a bridge." Jessica testified that, in reaction to the latter statement, she called 911, "opened the car door, [put her] hand and [her] foot out one side" and that defendant took her phone away and hit her with it. It was Jessica's further testimony that she then began "act[ing] as though * * * [she and defendant] were still going to be together after the incident."

According to her testimony, upon returning to the home she shared with defendant and their son, Jessica "immediately * * * started packing." Jessica next testified that, while she was packing in the bedroom, she heard "a gasping sound from the living room" and found defendant "hanging from the chandelier" "by a wire" "around his neck." Jessica stated that she then twice grabbed the chair he had stood upon in order to reach the chandelier and put the chair back underneath him; she added that she threatened to call 911. It was her testimony that defendant then removed the wire from his neck. Jessica stated at trial that she returned to the bedroom and told defendant that she was leaving.

According to Jessica's testimony, when defendant returned to the bedroom, she "could tell he was holding something behind him" and defendant "pulled out a knife." She testified that she was within five inches of the knife and "felt very afraid." She added that defendant threatened to stab her and to "slash [her] face." Jessica's testimony reflects the fact that she and

- 3 -

defendant moved to the bathroom and then to the kitchen while defendant was still holding the knife. She stated during her testimony that she had "tried to run" but "d[id]n't know where [she] was going." Jessica testified that she "decided [she] was going to tell [defendant] that it's okay, that this is not the worst thing ever that had happened between a couple, and that why d[id]n't [they] just go along about [their] day how [they] were supposed to." It was her testimony that she made that statement because she did not have access to a phone and could not "get out of the house."

It was further Jessica's testimony that she and defendant then left the apartment to go to a Taco Bell restaurant, and defendant left the knife in the apartment. She testified that, when they were inside the Taco Bell, defendant "wasn't able to eat;" she added that she took a bite of her taco and then told him "[y]ou have to go." It was her testimony that, upon her threat to "tell everyone what [he did]," he gave her back her phone and left the restaurant. Jessica testified that she then called her stepfather and asked him to come and pick her up.

It was Jessica's testimony that she went to the apartment she had shared with defendant only one time after the knife incident; she stated that she went to pick up some of her son's belongings while her mother and her son waited in the car. She added that she and defendant continued to communicate over the phone, by text message, and in person in the two weeks preceding the shooting. Moreover, it was Jessica's testimony that on April 23—the day of the shooting—she saw defendant at his place of employment when she went there "to collect $50." She added that she agreed to see him that night "[b]ecause he said he would bring [her] make-up and camera." Jessica stated at trial that defendant showed up around seven and they stood and talked on the porch of her mother's house, where she was staying. It was her further testimony that they were both calm until she told him she "went out" with some friends; she stated that at

- 4 -

that point she "saw that the conversation wasn't really going anywhere [and she] * * * started backing away." According to her testimony, she backed into the foyer, which was separated by a door from the living room.

When asked what happened next, Jessica testified as follows: "Once I was inside and just poking out my head, [defendant] had gotten up from * * * where he was at, like, sort of in an angle way, held onto the knob, opened it, and immediately, like, pulled out the gun from the back of his waist." She stated that defendant told her that he was not going to kill her but that he wanted to shoot her parents "[b]ecause he wanted [her] to understand what it felt like to be lonely and suffer." It was her testimony that defendant then opened the door into the living room and "at that point [she] was standing in front of him, and [she] looked towards [her] left, and [she] saw [her] mom's face, but then [she] focused [her] attention on [defendant], and [she] said, Don't do it. You don't have to do it. And by that time he was underneath [her] left arm. [She] was grabbing his – his arms, trying to get some sort of control, and he just raised [the gun], and he shot." It was Jessica's testimony that she did not know at the time that the shot had hit her mother.

According to her testimony, during her struggle with defendant over the gun, Jessica ended up on her knees with the gun being pointed at her temple and she heard "the click" of the trigger being pulled. She added that, after "the click," defendant "seemed shocked" and started "reaching for something in his pocket[.]" She stated that she was then able to push him into the foyer and close the door between the living room and the foyer. It was Jessica's testimony that she then heard defendant close the front door and leave. She added that she ran to her mother, applied pressure to her mother's wound, and called 911.

During her testimony on cross-examination,[3] Jessica acknowledged that she did not tell the grand jury that she had opened the door of the car and stuck her foot out of the door when she was in the car with defendant immediately preceding the knife incident. On cross-examination, Jessica was also asked if defendant had any marks on his neck after attempting to hang himself from the chandelier, and she testified that she did not notice. She acknowledged that she did not tell the police about the attempted hanging when she gave them a statement on April 23. Jessica further acknowledged that, following the incident with the knife, she called her stepfather from Taco Bell but she did not call the police; she added that her stepfather did not call the police after she told him what had happened. Jessica also elaborated on cross-examination with respect to the knife incident, stating that she and defendant had stopped at Bank of America on the way to Taco Bell. She testified that defendant left her in the car alone during their stop at the bank.

Jessica also added on cross-examination that, when defendant came to her mother's house on April 23, he sent her a text message which she did not read until after the shooting; according to Jessica's testimony, the text message read as follows: "Tell your mother I'm sorry." On redirect examination, Jessica stated that she received that text message before defendant arrived at the house. On further cross-examination with respect to the events of April 23, Jessica was confronted with the fact that she did not tell the police on that day that defendant "immediately pulled out the gun while he was closing the door."

Additionally, when confronted on cross-examination with the fact that she testified to the grand jury that, at the time the gun went off, her hands were on defendant's wrists, she acknowledged that that was what she said to the grand jury but stated: "That is not true." On

---

[3] The defendant alleges numerous inconsistencies in Jessica's testimony. Although we will not discuss every alleged inconsistency at length in this opinion, see footnote 8, infra, we shall recount Jessica's cross-examination and redirect examination in somewhat greater depth than would ordinarily be our practice.

redirect examination, she explained the discrepancy between her testimony before the grand jury and her testimony at trial as follows: "I wasn't mistaken. At that moment it was something that went by really quick. It could have been on his wrist, higher up on his arm, I did not know the exact location of where my hand was, * * * but it was on his forearm or on his wrist." During the continued cross-examination with respect to the shooting, Jessica stated that, after the shooting, when she managed to back defendant into the foyer, she shut, but did not lock, the door between the foyer and the living room. She further testified on redirect examination that she would have "taken [defendant] back" if he had received the counseling she thought he needed; also, it was her testimony on cross-examination that she did not "terminate[] the relationship" during their discussion on the porch.

Notably, it was Jessica's testimony on cross-examination that her mother was shot in the chest.

## 2. The Testimony of Theodora Nunez

Theodora Nunez testified that Jessica was her daughter. She also stated that, during the two-week period between the knife incident and the shooting, Jessica and defendant were "on the phone * * * constantly." She added that, on the night of the shooting, she heard Jessica tell defendant over the phone not to come to the house. It was also her testimony that, during the evening when Jessica and defendant were out on the porch, she heard Jessica tell defendant to go home and that she was "not going back." She further testified that, when she was shot, the gun was "to Jessica's * * * left shoulder;" on cross-examination, she testified that the gun was not underneath any part of Jessica's body. Her testimony on direct examination also indicated that

she was facing defendant when he shot her and that, when the bullet hit her, she felt the impact in her right chest.[4]

When Theodora was asked on cross-examination about Jessica calling her on the phone from Taco Bell on the evening of the knife incident, she stated that Jessica told her that she and defendant "had a fight" and that she "ran out of the car." It was further her testimony on cross-examination that Jessica asked to be picked up and that Theodora, who was in bed, "told" her husband to pick Jessica up. She also stated on cross-examination that, in the two-week period between the knife incident and the shooting, defendant dropped off some of Jessica's belongings at her house. Finally, it was her testimony that Jessica "c[a]me home every night" during that same period.

**B**

**Motion for a New Trial**

The defendant was ultimately convicted on all of the six counts before the jury. On April 24, 2015, he moved for a new trial based on his assessment of the weight of the evidence; it had been his argument at trial that the shooting was accidental. A hearing was held on defendant's motion on April 28, 2015. At the close of that hearing, the trial justice denied defendant's motion for a new trial. The trial justice acknowledged that there was some disparity between the testimony of Jessica and that of Theodora; however, he stated that "the two witnesses were * * * entirely consistent in their testimony that the defendant did level the gun at Theodora and fired at her." He found that Theodora was struck in the chest, not in the back, and he further stated that "[t]he credible evidence is clear that the defendant went to the Nunez residence with

---

[4]     Doctor Marco Andrea Giorgi was the surgical resident who testified at trial. During his testimony, he stated that he could not "confirm it a hundred percent" that the bullet entered Theodora's chest and exited through her back and not the other way around.

an intent to kill." The trial justice referenced the fact that defendant sent a text message to Jessica before the shooting saying, "'Tell your mother I'm sorry.'" He also found that a rational juror "could have clearly inferred that the defendant was intent on killing Jessica, too" on the basis of the testimony that Mr. Diaz grabbed Jessica's hair while she was "on her knees begging for her life" and "put the gun to her head." The trial justice stated that Jessica heard "that unmistakable clicking sound" while the gun was pointed to her head and that "it [was] plain that [defendant's] actions bespeak a man bent on violence." The trial justice also noted that there had been an earlier incident when defendant threatened Jessica with a knife and threatened to kill her.

With respect to the issue of whether or not the shooting was an accident, the trial justice noted that the jury was given an accident instruction, but he commented as follows about the jury's resolution of that issue: "[O]bviously, [the jury] determined that the State had negated the defense of accident beyond a reasonable doubt. And I concur with that conclusion." He further stated that "[a]ny suggestion that this was an accident seems hollow to me." The trial justice pointed to the fact that, after the shooting, defendant "said nothing," "[d]id nothing to assist [Theodora]," and did not "express any misgivings at the scene," but rather "fled to New York and tossed the gun in the river." The trial justice concluded by stating that "there was very little to command any verdict other than the one that the jury decided upon, and I am well satisfied that the evidence supported the guilty verdicts beyond a reasonable doubt."[5]

---

[5] We note that this final statement by the trial justice seems to reference an analysis of a motion for a new trial based on an argument that the evidence was legally insufficient to support the conviction despite the fact that the basis of the motion for a new trial in the instant case was a contention that the weight of the evidence was inadequate to convict defendant. See, e.g., State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011). However, we are satisfied, having reviewed the trial justice's entire decision, that, despite his final statement, the trial justice did conduct the proper analysis for a motion for a new trial based upon the weight of the evidence.

That being said, we take this opportunity to reiterate that a motion for a new trial based upon the weight of the evidence and a motion for a new trial based upon the sufficiency of the

Following the denial of his motion for a new trial, which is before this Court on appeal, defendant was sentenced to the following: (1) thirty years to serve on Count One; (2) thirty years to serve on Count Two, to be served concurrently with the sentence on Count One; (3) twenty years to serve on Count Three, non-parolable, to be served consecutive to the sentence on Count One; (4) ten years to serve on Count Four, non-parolable,[6] to be served consecutive to the sentence on Count Two; (5) ten years to serve on Count Five, to be served concurrently with the sentence on Count One; and (6) twenty years to serve on Count Seven, to be served concurrently with the sentence on Count One. The defendant appealed from the denial of his motion for a new trial.

## II

### Standard of Review

As we have frequently stated, a trial justice ruling on a motion for a new trial based upon the weight of the evidence "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Muralles, 154 A.3d 925, 931 (R.I. 2017) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013). In so doing, the trial justice must: "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also

---

evidence are two very different motions which require two different analyses. See State v. Greenslit, 135 A.3d 1192, 1198 n.3 (R.I. 2016); State v. Virola, 115 A.3d 980, 989 n.7 (R.I. 2015); Karngar, 29 A.3d at 1235.

[6] Although it is of no relevance to the issue before us, we note that the record contains an inconsistency with respect to whether or not the sentence imposed on Count Four is non-parolable: the clerk's note indicates that the sentence on Count Four is non-parolable, although the Judgment of Conviction and Commitment does not so indicate.

State v. Morales, 895 A.2d 114, 121 (R.I. 2006). If, upon concluding his or her three-step analysis, the trial justice "agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Muralles, 154 A.3d at 931 (internal quotation marks omitted); see also State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012). If the trial justice is not in agreement with the jury's verdict or does not believe that reasonable minds could differ, he or she must conduct a fourth step "to determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (internal quotation marks omitted); see also State v. Adefusika, 989 A.2d 467, 480 (R.I. 2010). The record "should reflect a few sentences of [the trial justice's] reasoning on each point." Muralles, 154 A.3d at 932 (internal quotation marks omitted). However, the trial justice "need not refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Robat, 49 A.3d at 71 (emphasis in original) (internal quotation marks omitted); see State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012).

This Court accords "great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Muralles, 154 A.3d at 932 (internal quotation marks omitted); see also Robat, 49 A.3d at 71. The reason we accord the trial justice such deference is that "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." State v. Paola, 59 A.3d 99, 104 (R.I. 2013) (internal quotation marks omitted). Accordingly, we will not "disturb a trial justice's decision on a motion for a new trial unless the trial justice committed clear error or * * * he or she overlooked or misconceived material and relevant evidence

- 11 -

[relating] to a critical issue in the case." Muralles, 154 A.3d at 932 (internal quotation marks omitted); see also State v. Payette, 38 A.3d 1120, 1127 (R.I. 2012).

**III**

**Analysis**

The defendant contends on appeal that the trial justice erred in denying his motion for a new trial for the following reasons: (1) Jessica's testimony about the assaults was incredible when weighed against the rest of the evidence; (2) Jessica's testimony was "internally inconsistent and inconsistent with Theodora's description of the events;" (3) the credible medical evidence "contradicted Theodora's testimony that she was shot in the chest, not the back;" and (4) "[a]ccording to Jessica, [defendant] had no motive to try to kill either of the Nunez women on April 23, 2014[.]"

**A**

**The Trial Justice's Decision on the Motion for a New Trial**

Upon a thorough review of the trial justice's decision and the record in the case, it is our judgment that the trial justice conducted an appropriate analysis of the motion for a new trial and did not err in denying that motion.

In compliance with the first step in the analysis, the trial justice considered the evidence in light of the jury charge. See Silva, 84 A.3d at 416. The trial justice specifically considered the evidence in the context of defendant's intent on the evening in question. He stated that the credible evidence was "clear" that defendant "went to the Nunez residence with an intent to kill;" he added that defendant's action "be[spoke] a man bent on violence." Moreover, he pointed to the fact that the jury was given an accident instruction but "obviously, determined that the State had negated the defense of accident beyond a reasonable doubt."

- 12 -

The trial justice further complied with the second analytical step relative to the motion for a new trial when he assessed the credibility of the witnesses and the weight of the evidence. See Morales, 895 A.2d at 121. The trial justice acknowledged that there were inconsistencies in and between the testimonies of Jessica and Theodora, but he stated that the witnesses were consistent when it came to the issue of defendant actually shooting Theodora. He further considered the fact that defendant sent a text message containing an apology to Jessica before the shooting and the fact that there had been an earlier incident, before the shooting, when defendant had threatened Jessica—the knife incident. The trial justice gave weight to Jessica's testimony that defendant put the gun to her head and, as the trial justice stated, she heard "that unmistakable clicking sound." Finally, the trial justice also weighed the evidence that showed that defendant did nothing to assist Theodora after the shooting, but rather "fled to New York and tossed the gun in the river." We note that the trial justice need not discuss all of the evidence supporting his decision, only enough to satisfy this Court that he "applied the appropriate standards." Robat, 49 A.3d at 71 (internal quotation marks omitted).

Lastly, the trial justice completed the third analytical step relative to the motion for a new trial when he determined that he would not have reached a result different from that reached by the jury. See Silva, 84 A.3d at 416. The trial justice expressly stated that he "concur[red]" with the conclusion of the jury that the state had "negated the defense of accident beyond a reasonable doubt." He also stated that there was "very little to command any verdict other than the one that the jury decided upon * * *." Due to the trial justice's conclusion on this third step in his analysis of the motion for a new trial, he was not required to proceed to the fourth step. See Robat, 49 A.3d at 71.

Accordingly, we are completely satisfied that the trial justice conducted the proper three-step analysis of the motion for a new trial; we are unable to perceive any error on the part of the trial justice in his denial of defendant's motion for a new trial.

**B**

**The Defendant's Contentions on Appeal**

Despite our determination that the trial justice did not err in his analysis or conclusion, we will briefly address defendant's specific arguments on appeal. Initially, defendant posits that Jessica's testimony was incredible when weighed against the rest of the evidence. He specifically avers that Jessica's description of the knife incident did not comport with her behavior towards defendant after the incident, such as continuing to communicate with him, agreeing to meet him in person, and stating that she would "take[] [him] back" if he went to counseling. The defendant also points to the fact that Jessica did not lock the door between the foyer and the living room after the shooting, stating that that act was "nonsensical when viewed in conjunction with her narrative." (Emphasis in original.) However, it is clear to us that, in essence, defendant's argument boils down to a question of whether or not Jessica was credible. We have stated that the "fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Jimenez, 33 A.3d 724, 738 (R.I. 2011) (internal quotation marks omitted). That is because we remain deferential to the trial justice, who is "present during all phases of the trial" and, accordingly, "is in an especially good position to * * * judge the credibility of the witnesses." Muralles, 154 A.3d at 932 (internal quotation marks omitted).

Secondly, defendant avers that Jessica's testimony was internally inconsistent and inconsistent with Theodora's testimony. By way of example, defendant alleges that Jessica's

- 14 -

testimony is internally inconsistent because she testified differently at different points in time; defendant alleges that Jessica told the police that her mother was shot in the back but testified at trial that she was shot in the chest. He also contends that she added facts to her trial testimony that she did not relate either to the police or to the grand jury; he points, for example, to her testimony that she opened the door to the car and stuck her foot out of the car while driving with defendant immediately before the knife incident and her testimony that defendant tried to hang himself from the chandelier. The defendant also details numerous allegedly inconsistent statements between the testimonies of Jessica and Theodora—e.g., the fact that: (1) Jessica testified that, when she and defendant were on the porch before the shooting, she had not ended the relationship—while Theodora testified that during the same conversation Jessica told defendant that she was "not going back" to him; (2) Jessica testified that, when the shot was fired, the gun was underneath her left arm—whereas Theodora testified that the gun was to the left of Jessica's body when it was fired; and (3) Jessica testified she "went out" with friends during the two-week period between the knife incident and the shooting—whereas Theodora testified that Jessica "c[a]me home every night."[7] However, inconsistencies in a witness's testimony do not "preclude a determination that the witness[] w[as] credible." State v. Lopez, 129 A.3d 77, 85 (R.I. 2016); see also State v. Jensen, 40 A.3d 771, 781 (R.I. 2012) (stating that

---

[7] The defendant additionally points out several alleged inconsistencies which in our judgment are not necessarily inconsistent; i.e., the fact that Jessica testified that defendant came over to her mother's house on April 23 to bring back her make-up and her camera while Theodora stated that she heard Jessica tell defendant not to come over that night and the fact that Jessica testified that she once went to the apartment she had shared with defendant during the two-week period between the knife incident and the shooting to collect her son's belongings while Theodora testified that defendant brought some of Jessica's belongings to Theodora's house. He also posits that Theodora's testimony with respect to getting a call after the knife incident from Jessica at Taco Bell and simply telling her husband to pick Jessica up was not commensurate with the gravity of the knife incident; that statement, however, ignores the fact that Theodora testified that Jessica only told her that she and defendant "had a fight" and that she "ran out of the car."

"the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief"). It is quite normal for "[p]ercipient witnesses [to] differ concerning some details about events in which they had some degree of involvement." Muralles, 154 A.3d at 934 (internal quotation marks omitted); see also Lopez, 129 A.3d at 85. As such, in our judgment, the presence of some inconsistencies in Jessica and Theodora's testimonies does not negate our belief that the trial justice conducted a proper analysis of the motion for a new trial and did not err in denying defendant's motion for a new trial.[8]

The defendant also contends that the credible medical evidence "contradicted Theodora's testimony that she was shot in the chest, not the back." Our thorough review of Theodora's medical records uncovered the fact that there are numerous statements within those records indicating that Theodora was shot in the back and numerous statements indicating that she was shot in the chest. Doctor Giorgi testified that he could not "confirm it a hundred percent" that the bullet entered Theodora's chest and exited through her back. However, Jessica testified that Theodora was shot in the chest. We are unable to perceive any error on the part of the trial justice in weighing the medical records and the testimony of Dr. Giorgi, Jessica, and Theodora and arriving at the conclusion that Theodora was shot in the chest. See Morales, 895 A.2d at 121.

---

[8] While we have sought to point to the majority of the inconsistencies within and between the testimonies of Jessica and Theodora which defendant references on appeal in our recitation of the pertinent testimony from trial and our discussion of defendant's contentions, we did not and need not address every single alleged inconsistency. It suffices to say that we have read and considered all of defendant's contentions, and we find no error in the trial justice's denial of defendant's motion for a new trial.

Finally, defendant posits that, according to Jessica's testimony, he had no motive to try to kill either Jessica or her mother. With respect to defendant's motive, we note that, even though Jessica testified that she would have "taken [defendant] back" if he went to counseling and that she did not terminate their relationship during their conversation immediately preceding the shooting, those statements alone do not rule out any possible motive for defendant to kill Jessica and Theodora; nor do those statements negate all other evidence of defendant's intent. It is the function of the trial justice on a motion for a new trial to weigh the evidence and make credibility determinations, and defendant's argument once again comes back to questioning which evidence the trial justice found credible. See id.; Paola, 59 A.3d at 104. It is clear to us that the trial justice appropriately exercised his role as the thirteenth juror in determining, based on the evidence he deemed credible, that defendant intended to kill Jessica and Theodora. Muralles, 154 A.3d at 931-32.

After an in-depth review of the record and of the parties' arguments on appeal, we simply cannot say that the trial justice "committed clear error or * * * overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." Id. at 932 (internal quotation marks omitted); see also Payette, 38 A.3d at 1127. Accordingly, we affirm the judgment of the Superior Court denying the defendant's motion for a new trial.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the Superior Court's denial of the defendant's motion for a new trial. The record may be returned to that tribunal.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Francisco Diaz. |
| **Case Number** | No. 2015-354-C.A. (P1/14-2042AG) |
| **Date Opinion Filed** | May 16, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General<br><br>For Defendant:<br><br>Angela Yingling<br>Office of the Public Defender |